In re GRANT et al.

(District Court, S. D. New York. September 2, 1902.)

1. BANKRUPTCY—CLAIMS—REFERENCE—DECISION—REVIEW.

Where a claim in bankruptcy is referred to a referee, ordinarily his finding will be accepted, as he had opportunity of hearing the witnesses; but, where the special attention of the court is asked by reason of cer-

¶ 1. Appeal and review in bankruptcy cases, see note to In re Eggert, 43 C. C. A. 9.

tain testimony which it is claimed must have been overlooked by the referee, his decision would be reviewed.

2. SAME—EVIDENCE—SUFFICIENCY.

Evidence in proceedings to establish claim against a bankrupt's estate reviewed, and *held* that an allowance thereof was erroneous in view of the uncertainty of the evidence presented by claimant, and particularly because alterations in his books introduced to establish claim.

R. Burnham Moffatt, for petitioner.

Guggenheimer, Untermyer & Marshall, for trustee.

ADAMS, District Judge. This is a review of a finding by the Referee expunging a claim filed by Thomas B. Stearns in the sum of $5,210.52 with interest from January 18, 1898, against the individual estate of Charles F. Grant, one of the bankrupts.

The claim arises out of a co-partnership formed the 1st day of September, 1884, between the said Stearns and Grant and one Sheldon for the purpose of carrying on a cattle business in the West, with headquarters at Durango, Colorado, and the principal controversy is with respect to the amount of salary which Grant was to receive for his services in conducting the business of which he had principal charge as manager and treasurer. It is not disputed that he was to have some salary. In the beginning, it was agreed that each partner should receive $45 per month while working for the firm, as well as expenses, and that the treasurer should receive $20 per month under similar circumstances. Sheldon retired in February, 1886, and the business was subsequently carried on by the remaining members, without any new general agreement, until 1898, when it was substantially closed. In the fall of 1886, Grant and Stearns met in Denver and an oral agreement was made between them respecting Grant's compensation thereafter. There were no witnesses to this agreement. It is claimed by Grant that it was agreed that he should have $1,200 for the remainder of the year 1886 and $2,400 per annum thereafter, without any conditions or limitations. On the other hand, Stearns contends that the agreement was that Grant should receive $200 per month while he was engaged upon the business of the firm on the ranch. Grant's claim amounts to $29,563.56, while Stearns only concedes to him $8,050, making a difference of $21,513.56, which with interest—and some minor matters which have not been pressed upon my attention—is the subject of contention. The referee has found in favor of Grant's contention and ordinarily his finding would be accepted, as he had the opportunity of hearing Grant and other witnesses testify, though not Stearns, whose testimony was taken by deposition in Colorado, but my special attention to the matter is asked by reason of certain testimony in the case which it is urged must have been overlooked by the Referee or was ignored by him because inconsistent with Grant's statements on the witness stand. The contention is that from Grant's own letters, from the books kept by him and from his own admissions when examined, it conclusively appears that his testimony with respect to the agreement is unworthy of belief.

The letters certainly are of a peculiar nature. In January, 1889, Grant became a partner in the firm of Grant Brothers, a New York stock brokerage firm, which became bankrupt in December, 1900.

In 1892 he became an active member of the firm and did not thereafter go West on the cattle business. Stearns was operating in stocks through this firm from 1892 until 1895 and made losses amounting to about $11,000, which he, finally settled in July, 1899. In the endeavor on the part of Grant to collect these losses and in connection with the cattle business, a voluminous correspondence took place between these disputants, extending over several years. In partial answer to the demands, Stearns endeavored, unsuccessfully until 1898, to obtain an accounting from Grant of the cattle business, in which he had put some $6,800. In the urgent efforts of Grant to get money from Stearns, he made revelations concerning the methods of conducting the business of the stock brokerage firm which go far to destroy the credibility of all knowingly connected with them. These letters he persistently requested should be destroyed but they were not and are now partially relied upon by Stearns to confute Grant's testimony. It nowhere appears in these letters that Grant claimed a salary of $2,400 per annum. When finally forced to account to Stearns in 1898, he then claimed such amount but Stearns promptly objected to any such allowance. While it is possible that an arrangement of the kind may have been made, it does not seem probable that it was in view of the provision for salary under the original articles and the nature and extent of the business, which were not such as to apparently warrant a salary of the amount claimed. On the other hand a provision for a monthly salary would have been suitable and likely for periods when Grant should be actually giving his entire time to the business. Moreover it seems highly improbable that if such an arrangement existed, Stearns would have permitted it to stand after 1892, when Grant became an active member of the brokerage firm in New York and was giving all his time to that business, while the cattle business was being cared for by a man named Pearse, who concededly was doing everything that Grant had previously been doing. This man was paid for his services at the rate of $1 per head of the cattle he handled, and his expenses. Grant said he paid him this amount out of his own funds but this does not seem to be supported by anything beyond Grant's testimony. The whole question is whether Grant's statements can be relied upon. As I have before intimated, the atmosphere of the case is adverse to a favorable consideration of his claim but there are stronger reasons for discrediting him. The books of the cattle firm, kept by Grant, were produced in evidence. In his letters to Stearns, he gave as a reason for not making the statement, which Stearns repeatedly called for, that the books were not written up. He there stated that he intended to give them his attention as soon as possible and in the meantime was urging Stearns to send him money on the brokerage account. In his testimony he said that, except for a short part of the time, the books were written up year by year. When at the end of the case he was asked by counsel for the trustee to explain what he meant by the statements in his letters, he said he meant that the books were not balanced!!! It was testified by a competent handwriting expert that all entries in the books after January, 1888, were probably made within a short time of each other, not exceeding a period of two years,

and it is strongly urged on the part of Stearns that no entries were made by Grant until he wrote up the books on or about 1898 to fit a charge of $2,400 for salary. The testimony of the expert, is not met by any corresponding testimony to, overcome the theories advanced, and the general appearance of the books tends to corroborate it. But the evidence concerning the books affords something more definite than material for expert opinions. There seems to have been two distinct periods of work on the books, the first ending with entries dated in December, 1887, made in black ink, which has become faded, and the other commencing with dates in the same month, made in violet colored ink, which remains fresh in appearance. In the book of original entry, called the "Cash Book," prior to the ending of the black ink entries, there is an entry dated Dec. 31, 1886: "To C. F. Grant, credit a/c salary Jany 1st/86/Jany 1/87 2400." The "2400" is written in violet ink over an obvious erasure of some other figures, which a magnifying glass shows ended with "oo." In the same book, prior to the ending of the black ink entries, there is an entry dated Dec. 31, 1886, "Expense a/c Salary C F Grant Jany 1st/86 to Jany 1/87, 2400." The "2400" is written in violet ink, over an obvious erasure of some other figures, similarly shown to end with "oo." In the same book there are similar changes with reference to the salary for 1887. Grant was examined by counsel for Stearns with respect to these erasures and figures and said the salary as stated in purple was wrong, that it should be "1200" and by mistake he made it "2400"; he further said that he could not recall the occasion for these changes. On the next hearing, several days later, upon being examined by the counsel for the trustee, he attempted an explanation of the erasures and new entries. He said:

"A. In 1890 in going through my books at that time, I was going through my cash book and found that I had charged $2400 of my salary in 1886. I turned back and by mistake I scratched out the year 1887 and after I got it scratched out I found I had the wrong year, as the cash book will show. It looked like the end of 1887, instead of that it was the end of 1888. I changed it back to $2400 as it should be for the year 1887. Then I scratched out for the year 1886 the charge to salary of $2400 a year—this is merely a cross-entry in my cash book—I crossed out the $2400 a year on both sides of the account with the idea of putting it as it should be $1200. I never knew until Mr. Moffatt showed me the other day, that by mistake I left it $2400 as it originally was. I refer you to my ledger of my salary account, that will show that erasure there where I had it $2400 for the year 1886, and changed it to $1200 for 1886. I would like to show you the cash book. (Witness does so.) I state here is a cross entry made in my cash book, salary Jan. to Jan. 1st, 1887, as I thought it was the year 1886, and I erased that, and on the other side you will see the same thing, and made it $2400. I started to change it to $1200; I erased both— I changed it and found that after I started to fill it out, it was a mistake, it should be $2400. Jan. 1st to Jan. 1st, 1888, $2400. I thought I was working the year 1886. I then came back to 1886, pages 48 and 49, and erased this; this was originally $2400 a year, and I made both erasures with the idea of changing it to $1200, as it should be, but by mistake I put it just the same again, and I never knew of it until Mr. Moffatt showed it to me the other day."

At this time the expert had not been examined. When he was called upon to testify concerning the entries, he said, he could see that the original entries were "1200" not $2,400, and he volunteered to prove it by the use of a chemical re-agent which he said would

temporarily bring back the original figures. At the next hearing, in the presence of the referee and all the parties, he applied the re-agent and gradually the figures "1200" did appear. I do not see why full credit should not be given to the demonstration, even if the expert's theories with respect to the periods of writing may not be accepted. Nor do I see how Grant's testimony can be credited in the face of the circumstances I have mentioned, particularly with re-spect to these erasures and the substituted figures. His explanation is evidently not correct and the facts as they appear, that is the orig-inal entries being "1200" instead of "2400," in both years, are more consistent with a claim of $200 per month while working on the ranch, which would doubtless include matters incidental to the ranch business, than an annual salary of $2,400. The original arrangement was for an equal division of the profits, less such amounts as were allowed to the partners, who did the work, with their expenses, and I regard it as far from established that any subsequent arrangement was made which changed the spirit of the original agreement so as to permit one of the partners to absorb, without regard to what he was doing for the firm, such a large annual sum as $2,400 out of a small business.

The decision of the Referee is reversed and the matter is remitted to him for further proceedings in conformity herewith.